## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JACK PEAK, | ) | CASE NO. 1:21-cv-2367 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| YELLOW CORPORATION, f/k/a | ) | |
| YRC WORLDWIDE, INC., | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is defendant's motion to transfer venue. (Doc. No. 15.) Plaintiff filed his opposition (Doc. No. 16), defendant filed a reply (as corrected) (Doc. No. 23) and, with leave, plaintiff filed a sur-reply (Doc. No. 26). For the reasons set forth herein, the motion to transfer is granted. Plaintiff has also filed a motion to dismiss the second and third claims in defendant's original counterclaim. (Doc. No. 18.) That motion has been rendered moot by the filing of the amended counterclaim and is denied without prejudice. Given the transfer of this case, this Court declines any ruling on plaintiff's second motion to dismiss the second and third claims in defendant's amended counterclaim (Doc. No. 27), leaving that to the transferee court.

**I.      Procedural Background**

On November 17, 2021, plaintiff Jack Peak ("Peak" or "plaintiff") filed a complaint against defendant Yellow Corporation ("Yellow" or "defendant") in the Cuyahoga County Court of Common Pleas. (Doc. No. 1-1 at 6–27.[1]) The complaint alleged claims for breach of contract,

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the electronic filing system, a citation practice recently adopted by this Court.

fraudulent inducement, and promissory estoppel. On December 20, 2021, Yellow removed the matter to this Court on the basis of diversity jurisdiction. (Doc. No. 1 ¶ 7.)[2]

On February 14, 2022, with leave and before Yellow had filed any responsive pleading, Peak amended his complaint to add a claim of reverse gender discrimination under Ohio law. (Doc. No. 11.) On February 28, 2022, Yellow filed its answer to the amended complaint, along with its counterclaims for breach of fiduciary duty, constructive fraud, actual fraud/fraudulent inducement/fraudulent misrepresentation, and civil conspiracy, plus a claim of unfair and deceptive trade practices specifically under both Ohio and Kansas statutory laws. (Doc. No. 13.) On March 21, 2022, Peak filed both an answer to the counterclaims (Doc. No. 17) and a motion to dismiss two of Yellow's counterclaims (Doc. No. 18). On April 11, 2022, Yellow filed an amended counterclaim, removing reference to Kansas law in the unfair/deceptive trade practices claim and adding an alternative claim for breach of contract. (Doc. No. 24.) On April 25, 2022, Peak moved to dismiss the same two counterclaims. (Doc. No. 27.) That motion is not yet fully briefed.

## II.     Factual Allegations

In his amended complaint, Peak lays out in considerable detail the factual allegations underlying his claims. Peak, an Ohio resident[3] and an attorney and executive with over twenty (20)

---

[2] Yellow has advised that this case may be factually related to a case filed by one Jack Strauch ("Strauch") against Yellow in North Carolina on April 13, 2021 and removed on May 13, 2021 to the Middle District of North Carolina (the "Strauch Case"). *See Jack Strauch v. Yellow Corporation*, Case No. 1:21-cv-378. Federal courts may take judicial notice of related "'proceedings in other courts of record.'" *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 972 n.5 (6th Cir. 2005) (quoting *Rodic v. Thistledown Racing Club, Inc.*, 615 F.3d 736, 738 (6th Cir. 1980); Fed. R. Evid. 201).

[3] Yellow is alleged to be a Delaware corporation with its principal place of business in Overland Park, Kansas. (Doc. No. 11 ¶ 2.) Yellow's motion notes that, in February 2022, it moved its headquarters from Overland Park, Kansas to Nashville, Tennessee. Notwithstanding that move, Yellow still retains its legal department, its labor department, and significant other operations in Overland Park, where it continues to employ about 1,000 people. (*See* Doc. No. 15 at 7 n.3.) Notably, Yellow maintained its headquarters in Overland Park for the entire time of Peak's tenure with Yellow, and Peak had an office there although he often worked remotely from Ohio. (*Id.* at 7 n.4.)

years of experience in the transportation industry (Doc. No. 11 ¶¶ 1, 7), alleges that he was approached in February 2020 by T.J. O'Connor, Yellow's Chief Operating Officer, about the possibility of returning to work for Yellow.[4] (*Id.* ¶¶ 17–18.) Peak outlines a series of phone calls and meetings with O'Connor wherein the two allegedly discussed Peak's possible role. Eventually, O'Connor arranged an in-person meeting on March 13, 2020 with Yellow's Chief Executive Officer Darren Hawkins ("Hawkins") and Board of Directors Chair Matt Doheney ("Doheney"). (*Id.* ¶ 25.) During the meeting, Peak claims he "shared his ideas and vision for [the] new role[,]" which included "a holistic approach to labor relations, with most non-securities-related legal functions being placed under his control and responsibility[,]" along with "litigation and claims, workers compensation, contracts, risk management and insurance, employee complaints, and [Yellow's] ethics hotline." (*Id.* ¶¶ 26–27.) Peak alleges that if he "had . . . not been permitted to implement his vision for these functions—with the teams he selected—he would not have agreed to work for [Yellow]." (*Id.* ¶ 28.) Peak claims "O'Connor, Hawkins, and Doheney all agreed with Peak's vision and the proposed scope of his position. They were willing to give Peak authority to make whatever changes were necessary to implement his ideas, including assembling and engaging his own teams." (*Id.* ¶ 29.)

Peak wanted to wait to join Yellow until after the anticipated sale of AWP in late 2020; Yellow agreed to Peak's timeline and proposed that he work as a consultant to Yellow in the meantime, formally engaging him in that role on June 25, 2020. (*Id.* ¶¶ 30, 32.) Peak also claims

---

[4] Peak had originally worked as Assistant General Counsel for Yellow's predecessor beginning in 2003. (Doc. No. 11 ¶ 8.) In the fall of 2009, Peak was promoted to Vice President of Labor Relations, Employment, and Litigation; at the same time he was placed in charge of negotiations with the union representing the majority of defendant's employees. (*Id.* ¶ 10.) In 2012, the legal office in Akron, Ohio where Peak was located was eliminated and Peak left defendant's employ, joining Area Wide Protective ("AWP") as its Executive Vice President and Chief Legal Officer. (*Id.* ¶¶ 14–15.)

he was advised by Yellow that he would be considered for the open General Counsel position (*Id*. ¶ 31); but, in late September 2020, Yellow named Leah Dawson ("Dawson") to that position (without consulting Peak), allegedly because she was a woman and Yellow wanted to increase the diversity of its executives following the award of a substantial CARES Act loan. (*Id*. ¶¶ 38, 39.) This is the basis for Peak's reverse gender discrimination claim.

Peak finally began his employment with Yellow on January 4, 2021, reporting to Overland Park, Kansas. (*Id*. ¶¶ 54, 90.) He alleges that, prior to that time, he and O'Connor had many conversations about the scope of his duties and also about Peak's insistence that he must be allowed to hire his own team, including Jack Strauch, a prominent transportation attorney in North Carolina. (*Id*. ¶ 35.) Peak claims that he and O'Connor negotiated the terms of Peak's employment to include: a January 4, 2021 start date; a monthly base salary of $400,000; a signing bonus of $100,000 to be paid on February 28, 2021 and fully retained by Peak after one year of employment or "termination by the company other than for cause[;]" participation in Yellow's short- and long-term executive incentive programs; and severance in the form of "continued payment of [his] then-current base salary" for eighteen (18) months after termination. (*Id*. ¶ 54.) Peak alleges he was entitled to severance if he terminated his employment for "good reason," which included "any diminution in [his] duties and responsibilities, including, but not limited to, authority to take employment actions commensurate with assembling and maintaining teams to perform responsibilities within typical relevant budgets." (*Id*. ¶ 55.) Peak alleges that, when he accepted Yellow's offer of employment on these terms, he "turned down millions of dollars from AWP— because he was interested and excited about the opportunity to implement his vision for [Yellow] . . . ." (*Id*. ¶ 62.)

4

When Peak returned the executed employment offer to O'Connor, "he noted in the accompanying e-mail that it did 'not list the areas of responsibility that fall within my position'" (*Id.* ¶ 59), which Peak identified, based on his discussions with O'Connor, as "'all litigation; BIPD [bodily injury and property damage]; risk & insurance, worker's compensation; subrogation; employment claims and litigation; cargo claims; contracts; the ethics hotline; and any matters related to these functions.'" (*Id.*) Peak offered to add these items to the agreement and to return a newly signed copy. (*Id.*) Peak alleges that "[n]either O'Connor nor any other representative of [Yellow] responded to Peak's e-mail or disputed Peak's understanding of his job description." (*Id.* ¶ 60.) Peak further alleges that O'Connor "forwarded Peak's signed Employment Offer to Hawkins, [Sean] Saunders [Yellow's Vice President of Human Resources], and other employees of [Yellow] on December 21, 2020." (*Id.* ¶ 61.)

Peak alleges that, after he reported to Yellow for work in January 2021, it became apparent that Dawson (Yellow's new General Counsel) was not on board with the agreement Peak and O'Connor had allegedly negotiated relating to the transfer of certain of Dawson's legal duties to Peak. (*Id.* ¶ 93.) It also became apparent to Peak that Hawkins (the Chief Executive Officer) had no intention of honoring the employment agreement and had merely made promises in order to induce Peak to leave AWP. (*Id.* ¶ 95.)

Nonetheless, Peak continued his pre-employment negotiations with Strauch, allegedly with O'Connor's knowledge and consent, with an eye toward hiring Strauch to supervise and manage Yellow's litigation, claims, and other legal functions. (*Id.* ¶ 71.) Although O'Connor had advised Peak that he would be unable to obtain Yellow's approval for an offer to Strauch with the terms Peak had proposed, Peak alleges that O'Connor authorized him to "be creative" with respect to

5

Strauch's salary and benefits and, ultimately, that O'Connor suggested Peak hire Strauch in a consulting role. (*Id*. ¶¶ 74, 76–77.)

Peak subsequently engaged Strauch, who signed a consulting agreement on January 9, 2021. Strauch was allegedly hired "to evaluate, supervise, and manage the litigation programs of [Yellow] and its subsidiaries," and would report to Peak. (*Id*. ¶ 78.) The consulting agreement allegedly contained a provision that Strauch could terminate it in the event "Peak [were to] cease being responsible for [Yellow's] litigation and claims programs." (*Id*. ¶ 80.) In the end, Peak was not given responsibility for those programs (*Id*. ¶ 98), which ultimately resulted in Peak's resignation (*Id*. ¶ 101), followed by that of Strauch.

Peak claims he would not have accepted the position with Yellow had he known at the time that "[Yellow] would not place certain labor relations functions—including litigation and claims—under his responsibility[;]" that [Yellow] would restrict his ability to hire certain individuals for his team—including Jack Strauch[;]" and that "[Yellow] would not allow him to implement his full vision for [Yellow's] labor relations and the legal functions committed to him[.]" (*Id*. ¶¶ 63, 64, 65.)

Peak worked for Yellow from January 4, 2021 through March 16, 2021, when he delivered a letter of resignation to O'Connor based on Yellow's alleged complete failure to honor the various terms of its employment agreement with Peak. (*Id*. ¶ 101.) Peak claims that, since he had "good reason" to terminate his contract of employment, Yellow is now required to make severance payments, which it has refused to do. (*Id*. ¶¶ 102–03.) Peak has been unable to find alternative employment since his resignation. (*Id*. ¶ 105.)

Peak's amended complaint seeks relief for breach of contract, fraudulent inducement, promissory estoppel, and gender discrimination.

In its amended counterclaim, Yellow asserts that there is no valid, enforceable contract between the parties because, by his own admission, Peak attempted to change the employment offer by insisting it included certain duties, but, as further admitted by Peak, no one from Yellow responded—effectively rejecting his attempt to alter the terms. (Doc. No. 24 ¶¶ 4–5.) In the alternative, Yellow claims that, if there is a valid, enforceable contract, Peak breached it. (*Id.* ¶ 6.)

Yellow's amended counterclaim implicates the lawsuit filed by Jack Strauch in North Carolina, noted above. Yellow generally alleges here that Peak and Strauch engaged in a conspiracy to defraud Yellow "by purporting to enter into a contract with Strauch on [Yellow's] behalf—on terms unfavorable to [Yellow]—despite that [Yellow] had previously, and explicitly, refused to hire Strauch on the terms and conditions purportedly offered to Strauch by Peak." (*Id.* ¶ 1.) Yellow alleges that, in entering into the agreement with Strauch, "Peak utterly ignored [Yellow's] instructions and its best interests, (sic) and failed to follow [Yellow's] policies and procedures of which he knew or should have known, by secretly offering a consulting agreement . . . to Strauch without authority or approval from [Yellow]." (*Id.* ¶ 16.)

Yellow seeks relief on counterclaims for breach of fiduciary duty; deceptive trade practices; constructive fraud; actual fraud, fraudulent inducement, and fraudulent misrepresentation; civil conspiracy; and, in the alternative, breach of contract.

**III.     Discussion**

    **A.     Standard of Review**

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought[.]" 28 U.S.C. § 1404(a). Section 1404(a) is intended to "protect litigants, witnesses and the public against

unnecessary inconvenience and expense[.]" *Cont'l Grain v. The FBL-585*, 364 U.S. 19, 27, 80 S. Ct. 1470, 4 L. Ed. 2d 1540 (1960).

Due to the permissive language in the statute, this Court has broad discretion to grant or deny a motion to transfer. *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). "The party seeking transfer bears the burden of proving that the transferee district is a superior venue to the transferor district." *Phelps v. United States*, No. 1:07-cv-02738, 2008 WL 5705574, at *1 (N.D. Ohio Feb. 19, 2008).

"Typically, more than one forum could be an appropriate venue for trial and some inconvenience will exist to either party no matter which venue is chosen." *Siegfried v. Takeda Pharm. N. Am., Inc.*, No. 1:10-cv-2713, 2011 WL 1430333, at *2 (N.D. Ohio Apr. 14, 2011). Thus, if transferring venue will merely "shift the inconvenience from one party to another," a change of venue is inappropriate. *Id.* at *2 (citing among authority *Van Dusen v. Barrack*, 376 U.S. 612, 646, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964)).

A district court decides motions to transfer on a case-by-case basis, *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 28, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988); *Norwood v. Kirkpatrick*, 349 U.S. 29, 75 S. Ct. 544, 99 L. Ed. 789 (1955), using a two-step analysis. First, the court must determine whether the case "might have been brought" in the transferee court. *Cont'l Grain*, 364 U.S. at 21. The parties here seem to agree that this action "might have been brought" in either Ohio or Kansas—rendering each a "proper" forum. The issue argued is which, if either, is the superior forum.

After determining where the case "might have been brought," the court then analyzes factors related to "the convenience of the parties and various public-interest considerations." *Atl.*

*Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 62, 134 S. Ct. 568, 187 L. Ed. 2d 487 (2013).

"Factors relating to the parties' private interests include 'relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Id.* at 62 n.6 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981)).

Public-interest factors include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* (quoting *Piper Aircraft*, 454 U.S. at 241 n.6).

Importantly, no one factor that a district court should consider is determinative. *Stewart v. Dow Chem. Co.*, 865 F.2d 103, 106 (6th Cir. 1989). The moving party has the burden of establishing that the factors weigh "strongly" in favor of transfer. *Picker Int'l, Inc. v. Travelers Indem. Co.*, 35 F. Supp. 2d 570, 573 (N.D. Ohio 1998) (citing *Bacik v. Peek*, 888 F. Supp. 1405, 1414 (N.D. Ohio 1993)).

**B.    Analysis**

In its motion to transfer, Yellow asserts that Peak and Strauch engaged in a fraudulent scheme that they now seek to enforce by bringing separate lawsuits against Yellow in separate jurisdictions in an effort to "prevent a full and fair examination of their joint misconduct." (Doc. No. 15 at 6.) Yellow argues that this action and the *Strauch* action in North Carolina "are closely related, implicate common issues of fact and law, and will require Yellow to produce the same

documents in discovery and the same witnesses for deposition and trial." (*Id*. at 6–7.) Yellow claims that "[t]he transfer of *these actions* to the District of Kansas, where Peak was employed by Yellow, will allow for the most efficient resolution of the disputes among the parties." (*Id*. at 7 (emphasis added).)

Of course, this Court has no jurisdiction over the North Carolina case so as to order any transfer of that matter to Kansas. Further, plaintiff's sur-reply brief informs this Court that the district judge in North Carolina has issued an order denying Yellow's motion to transfer venue or, in the alternative, to stay the *Strauch* case pending resolution of the instant case.[5] (*See* Doc. No. 26-1.) The sur-reply also points out that Yellow's amended counterclaims are brought only under Ohio law, having abandoned any claims under Kansas law asserted in the original counterclaims. (Doc. No. 26 at 2–3.)

To the extent the alleged "relatedness" of this case and the *Strauch* case may have otherwise proven relevant to this Court's analysis of the question of transfer, that issue has been rendered moot by the order of the North Carolina district court declining to order transfer.[6]

As a threshold matter in this analysis, although a plaintiff's choice of forum is ordinarily given substantial weight, it "is entitled to somewhat less weight when the case is removed to federal court because the plaintiff is no longer in his or her chosen forum, which was state court." *Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp. 2d 941, 947 (S.D. Ohio 2002). In such an instance,

---

[5] The *Strauch* case was filed several months before the instant case and is in a very different procedural posture. Discovery is underway; dispositive motion briefing has commenced; and an October 2022 trial date is anticipated. (Doc. No. 16 at 15.) The case was set for mediation in June, but that appears to have been unsuccessful. In this case, given the pending motions, the Court has yet to conduct the initial Case Management Conference.

[6] No one has sought transfer of the instant case to North Carolina because it obviously could not have been brought there in the first instance.

"[p]laintiff's choice of forum, while relevant to the issue of transfer, is not entitled to the substantial weight that it otherwise might receive." *Id*.

Yellow's motion argues that the private interest factors favor transfer to Kansas.

Yellow argues that the vast majority of evidence relevant to both Peak's claims and Yellow's counterclaims is located in Kansas, not Ohio—specifically, communications between Peak and Yellow regarding Peak's desire to retain Strauch and regarding his compensation arrangements if he were retained; Yellow's representations concerning Peak's authority; and the terms under which Yellow would consider retaining Strauch or any other legal consultant, including Yellow's policies and procedures regarding the need for prior authorization of such arrangements. (Doc. No. 15 at 14–15.) As pointed out by Yellow, Peak cannot meaningfully dispute the fact that the majority of evidence is located where Yellow was headquartered during the time of Peak's employment and where Yellow's legal department was, and still is, located— the very Kansas location where Peak reported for duty no fewer than ten (10) times during his seventy-one (71) days of employment with Yellow. (Doc. No. 23 at 5.)

While this factor does weigh in favor of transfer to Kansas, it does not weigh heavily in favor of transfer. "The location of documents [as opposed to physical evidence] is a minor consideration because documents may be sent easily by mail, copied, or even faxed to another location." *Campbell Soup Supply Co., LLC v. Direct Contact, LLC*, No. 5:18-cv-942, 2018 WL 6248531, at *4 (N.D. Ohio Nov. 29, 2018). In the *Strauch* case, Yellow has already produced more that 5,500 documents from Kansas to North Carolina and, pursuant to subpoena, Peak has produced 3,920 pages from Ohio to North Carolina. (Doc. No. 16 at 11.) Production in the instant case should be no more difficult.

11

Yellow argues that "[a] number of material witnesses are also located in Kansas—not Ohio." (Doc. No. 15 at 15.) In its declaration in support of its motion, Yellow identifies the following as Peak's possible witnesses: James Faught, Diane Meyers, Patrice Brown, and Joseph Pec. All are employed at Yellow's facility in Overland Park, Kansas. (Doc. No. 15-2 ¶ 15.) Yellow claims that "[r]equiring [its] non-executive employees and members of [its] senior management to travel to [Ohio] to participate in the trial . . . would be inconvenient to them and disruptive to Yellow's operations." (Doc. No. 15 at 15 (citing Doc. No. 15-2 ¶¶ 15, 16).)

In opposition, Peak claims that he has not yet identified his witnesses in this case and that Yellow must be speculating based on a declaration Peak filed in the *Strauch* case wherein he identified several individuals in Kansas with whom he "exchang[ed] emails . . . regarding his responsibilities and authority." (Doc. No. 16 at 12.) The Court takes judicial notice of this declaration, which is Doc. No. 35-1 in *Strauch*, and which the Court was able to access through PACER.[7] But Peak claims these persons are not "key witnesses" (from his perspective) because they "were [not] involved in [his] recruitment, negotiation, or hiring[.]" (*Id.*) He does not deny that they are all located in Kansas.

Peak's declaration in the *Strauch* case quite clearly identifies each of these persons as potential fact witnesses, whether or not Peak now characterizes them as "key witnesses."

> ***As to James Faught***: Peak claims that, while employed by Yellow, Peak "exchanged multiple emails using [his] company email address with James Faught, defendant's Controller" and that in those emails, Peak and Faught "discussed programs over which [Peak] was hired to have control and responsibility." Peak also personally met with Faught and "it was clear to [Peak] that, before [they] spoke, Mr. Faught already had learned [Peak] was hired to have control of and

---

[7] The Peak declaration was filed in support of a motion to compel filed by Strauch. Although Peak asserts in his opposition to the instant motion that the motion to compel remains pending, according to the docket of the *Strauch* case, the motion was resolved on April 14, 2022, after Peak filed his opposition here.

12

authority for defendant's litigation and claims programs[.]" (*Strauch*, Doc. No. 35-1 ¶¶ 8–9.)

***As to Diane Meyers***: Peak claims that, while employed by Yellow, Peak "exchanged multiple emails using [his] company email address with Diane Meyers, who runs defendant's insurance program. Those emails reflect on and provide information about [Peak's] duties as a Yellow Corporation employee since one of the duties [he] was hired to perform was to be responsible for defendant's insurance program." Peak also personally met with Meyers and "it was clear that she already knew [he] was hired to, among other things, be responsible for the insurance program. . . . Ms. Meyers and [Peak] talked about the scope of [his] position, including [his] broad responsibility for numerous aspects of the legal department, specifically including [his] responsibility over defendant's litigation and claims programs." (*Id*. ¶¶ 10-11.)

***As to Patrice Brown*** **and** ***Joseph Pec***: Peak claims that "[a]bout two weeks after [he] started working [at Yellow] one of the lawyers in defendant's legal department, Patrice Brown, scheduled a meeting with [Peak] . . . to discuss the fact that [Peak] was taking over responsibility for defendant's litigation and claims programs, including labor and employment litigation. and that she would therefore report to me going forward." Peak further claims that "[i]t was clear to [Peak] during [their] meeting that Ms. Brown had earlier been informed that [Peak] would be responsible for these programs and that she would report to [him]." Peak claims that "[a]round the same time, Joseph Pec, another attorney working in defendant's legal department came to [Peak's] office to talk. [Pec] began the conversation by stating: 'I understand I report to you [Peak] now' or words substantially to that effect." Peak asserts: "Because Mr. Pec had responsibilities for defendant's litigation and claims programs, it was clear to me [Peak] that he [Pec] had earlier been informed that [Peak's] duties included being responsible for those programs." (*Id.* ¶ 14.)

These brief excerpts from Peak's declaration in *Strauch* demonstrate the disingenuousness of his argument here that these potential witnesses should not affect the transfer analysis.

Peak further claims that his "key witnesses . . . are scattered throughout the United States." (*Id*. at 13.) He identifies them as O'Connor, Yellow's COO (located in Florida); Strauch, Peak's alleged "co-conspirator" (in North Carolina); Hawkins, Yellow's CEO (in Tennessee); and Doheny, Yellow's Board Chair (in New York). (*Id*.) Peak concludes that all of these witnesses would be "equally inconvenienced in the Northern District of Ohio or the District of Kansas." (*Id*.)

13

In reply, Yellow argues that Peak's position regarding the "non-key" witnesses is not credible, given his declaration in the *Strauch* case regarding his discussions with them and their alleged understandings about "the nature and scope of [Peak's] employment[.]" (Doc. No. 23 at 12.) Yellow claims that Peak is ignoring "the fact that the claims in this lawsuit necessarily go to the very issues concerning which Peak previously attested that these individuals possess knowledge, such as 'the duties [he] was hired to perform'." (*Id.* (citing Peak's declaration in *Strauch* ).) Yellow also challenges Peak's suggestion that because the people Peak identifies as *his* key witnesses are accustomed to travel for work, any need to come to Ohio for litigation would not be "detrimental, disruptive, or extraordinarily inconvenient to the organization." (*Id.* (quoting Doc. No. 16 at 13).)

Although the factor of witness location is entitled to somewhat less weight when witnesses are employees of a party, *Nationwide Mut. Fire Ins. Co. v. Barbour*, No. 5:15-cv-456, 2015 WL 5560209, at *3 (N.D. Ohio Sept. 21, 2015), the location of the *majority* of witnesses must be given some consideration, and Yellow's unrebutted declaration that requiring all of these employees to travel to Ohio *would* be disruptive must be given some deference. *See, e.g.*, *Thomas v. Home Depot, U.S.A., Inc.*, 131 F. Supp. 2d 934, 939 (E.D. Mich. 2001) ("Congress never evinced an intent to protect only non-employee witnesses. . . . It may be no less inconvenient for a witness who happens to work for a defendant corporation to travel hundreds of miles for judicial proceedings than it would be for any other witness to do so."); *DeFrank v. Samsung Elecs. Am., Inc.*, No. 1:18-cv-296, 2019 WL 6828357, at *4 (S.D. Ohio Dec. 13, 2019) (finding the employee/non-employee convenience distinction "not controlling") (citing *Thomas*). It is notable that, of all the persons identified as potential witnesses, *only Peak* resides in Ohio; everyone else is either in Kansas or in various other states. The only person who would *not* be inconvenienced if

14

the case were to remain here would be Peak. Therefore, despite Peak's argument to the contrary, this factor does weigh in favor of transfer.[8]

Yellow also points out that Strauch, a critical witness, probably cannot be required to attend trial in this district, whereas he could be required to attend in Kansas. (Doc. No. 15 at 16 n.9.) Peak has not responded to this assertion, much less denied it. Because Strauch is a *critical* witness, this factor weighs heavily in favor of transfer. Although there are alternatives to an in-person appearance by Strauch, *see* Fed. R. Civ. P. 43(a) (permitting "for good cause in compelling circumstances and with appropriate safeguards . . . testimony in open court by contemporaneous transmission from a different location[]"), this alternative is not satisfactory given the likely importance of Strauch's testimony.[9]

From the standpoint of which law would apply, there is nothing in particular about Peak's current claims, except perhaps the *one* for gender discrimination brought under Ohio law,[10] that would favor this venue. Any district judge in Kansas is capable of resolving Peak's claims, including his claim of gender discrimination brought specifically under Ohio law. And, although Peak argues in his sur-reply that Yellow abandoned its counterclaim for deceptive trade practices under Kansas law and added an alternative breach of contract claim that is arguably governed by

---

[8] Yellow relies upon *Larion v. Aircraft Serv. Int'l, Inc.*, No. 1:19-cv-2597, 2020 WL 1248781, at *5 (N.D. Ohio Mar. 16, 2020) as being "instructive." (Doc. No. 15 at 16.) Yellow argues that, in *Larion*, this Court granted a motion to transfer "reasoning that most of the witnesses resided in Texas, and that Larion 'was employed by an employer headquartered in Texas, and the *decision* to terminate his employment' therefore 'would have been made' in Texas, and that the 'records relating to the decision-making process . . . are also located there.'" (*Id.* (emphasis and alteration in original) (quoting *Larion*).) But Peak challenges that reliance, correctly in this Court's view, because in *Larion*, although venue was *not proper* in this district, neither could the Court conclude that dismissal would be appropriate; thus, transfer to Texas was the better alternative.

[9] The district judge in North Carolina reached the same conclusion regarding Peak's likely unwillingness to voluntarily appear to testify in the *Strauch* case. (*See* Doc. No. 26-1 at 4 (citing Fed. R. Civ. P. 43(a)).)

[10] Further, the gender discrimination claim would likely have a counterpart in Kansas law.

Ohio law, that does not alter the analysis. Regardless of which law may ultimately apply, this factor is neutral.

Peak's residence in Ohio arguably makes Ohio more "interested" in the outcome than Kansas would be, at least with respect to Peak. But Kansas would undoubtedly be more interested in the outcome with respect to Yellow. Therefore, residence of the parties is a neutral factor.

Finally, as to Yellow's argument regarding docket congestion," the Court finds that the minor disparity in the number of civil filings in this district versus the District of Kansas (*i.e.*, 231 vs. 218) does not favor transfer to Kansas, and the comparative number of weighted filings per judge in the two districts (*i.e.*, 357 vs. 301) only slightly favors Kansas.

Given all the above, the Court concludes that two factors—the location of the witnesses and the ability to compel possibly unwilling witnesses—strongly favor transfer. The majority of the witnesses are located in Kansas and, importantly, Peak has not disputed that Strauch is a critical witness who likely can be haled into court in Kansas (because of his connections there), but not in Ohio. Without these witnesses and, in particular, without Strauch, both parties would be disadvantaged in presenting their cases. Therefore, Yellow has met its burden of showing that Kansas is the "superior venue." This determination is further supported by all of the other factors cited above that favor transfer to Kansas.

### IV.    Conclusion

For the reasons set forth herein, Yellow's motion to transfer venue (Doc No. 15) is granted. Further in light of Yellow's filing of an amended counterclaim, the Court concludes that Peak's motion (Doc. No. 18) to dismiss two claims in the original counterclaim has been rendered moot and is, therefore, denied without prejudice. Plaintiff's second motion to dismiss the second and

third claims for relief in defendant's amended counterclaim (Doc. No. 27) is properly left for resolution by the transferee court.

Accordingly, the Clerk is directed to transfer this action to the United States District Court for the District of Kansas.

**IT IS SO ORDERED**.

Dated: July 15, 2022

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**