## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JACK PEAK,

       *Plaintiff,*

  vs.

                                  Case No. 22-CV-02278-EFM

YELLOW CORPORATION f/k/a YRC
WORLDWIDE, INC., THOMAS JOSEPH
O'CONNER III, and DARREN HAWKINS,

       *Defendants.*

## MEMORANDUM AND ORDER

Before the Court are three Motions.  These are Defendants' Motion to Dismiss Count II of Plaintiff Jack Peak's Second Amended Complaint (Doc. 80), Plaintiff's Motion to Dismiss Defendant's Counterclaim (Doc. 98), and Plaintiff's Motion for Judgment on the Pleadings.

Peak originally sued his former employer, Yellow Corporation, as well as its COO Thomas O'Connor and its CEO Darren Hawkins for breach of contract, fraudulent inducement, promissory estoppel, gender discrimination, and retaliation.  Defendants counterclaim against Peak for breach of fiduciary duty, fraud, civil conspiracy, conversion, and in the alternative, breach of contract. For the reasons laid out below, Defendants' Motion to Dismiss is denied, Plaintiff's Motion to

Dismiss Defendants' Counterclaim is granted in part and denied in part, and Plaintiff's Motion for Judgment on the Pleadings is denied.

## I.     Factual and Procedural Background[1]

### A.     Allegations of the Second Amended Complaint

This case is about the events leading up to and during Peak's brief period of employment with Yellow.  Yellow is one of the largest transportation and freight companies in North America. Peak is an attorney with over 20 years of experience in the transportation industry.  He previously worked for Yellow in its Akron, Ohio office in a labor relations role until the office was closed in 2012.  Peak then joined Area Wide Protective ("AWP") as its Executive Vice President and Chief Legal Officer, a position he held until he returned to Yellow in early 2021.

In February 2020, Peak was contacted by O'Connor.  The two scheduled a dinner meeting on February 20, 2020, in Cleveland, Ohio to discuss potential employment for Peak at Yellow.  At the dinner, O'Connor made an informal offer for Peak to lead Yellow's labor relations team.  While Peak did not accept at that time, he expressed excitement at the opportunity and the recruitment process continued.

O'Connor and Peak scheduled a meeting at the Westin Detroit Metropolitan Airport Hotel on March 13, 2020.  They were joined by Hawkins and the Chairman of Yellow's Board of Directors, Matt Doheny.  According to Peak, he shared his vision for his new position at Yellow

---

[1] These facts come from the allegations in the pleadings alone.  The Court does not consider the 13 exhibits Plaintiff has attached to his various motions and responses, because Defendants do not concede their authenticity. *Dunmars v. Ford Cnty., Kansas Bd. of Comm'rs*, 2019 WL 3817958, at *3 (D. Kan. 2019) ("[W]hile the court typically must consider only the complaint itself when ruling on a motion to dismiss, it may also consider documents which are central to the complaint and whose authenticity is undisputed"); *see also Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017).  That said, these facts do contain quotations taken from the Second Amended Complaint, which may correspond to the material in the many cited exhibits.  The Court treats these as it would any other allegation in complaint at this stage.

during the meeting.  This vision included taking a "holistic approach" to labor relations, with most non-securities-related legal functions—including litigation, claims, worker's compensation, contracts, risk management, insurance, employee complaints, and ethics—placed under his control.  Peak alleges that Hawkins, Doheny, and O'Connor expressed agreement with this new approach.  They were, according to Peak, willing to give him authority to make whatever changes were necessary to implement his ideas, including the authority to assemble and engage his own teams.  Peak represents that he would not have been interested in re-joining Yellow if his responsibilities were restricted to solely labor relations, as he would have viewed that as a step back in his career.

Peak informed Defendants that he preferred not to join Yellow immediately as he planned to stay with AWP through its anticipated sale in late 2020.  Defendants were willing to accommodate Peak's timeline and proposed that Peak work as a consultant in the meantime. Yellow and Peak entered a formal consultancy agreement on June 25, 2020.

During Peak's time as a consultant, he began preparing for his future role.  This included identifying and interviewing candidates for in-house positions under him, such as Jack Strauch, a transportation attorney in North Carolina.  Peak alleges this was done with Yellow's knowledge and permission.  Peak further alleges that he and O'Connor discussed hiring Strauch later in the year.  Peak also provided O'Connor with a list of his objectives for Yellow's new labor relations division under his leadership, including assembling a team of new hires and crafting a plan to be approved by Yellow's leadership.

Yellow's General Counsel position was vacant while Peak was being recruited by Yellow. In a discussion with O'Connor, Peak proposed that he should fill the position.  He reasoned that, under his proposed holistic approach to labor relations, much of the General Counsel's

responsibilities already would fall to him.  According to Peak, O'Connor agreed that this was a good idea and advised Peak that he had previously discussed it with Hawkins as well.  Peak proposed a meeting between himself, O'Connor, and Hawkins to discuss the General Counsel position.  O'Connor agreed to coordinate the meeting and, at Peak's request, provided Peak with copies of the organizational charts and budgets for several Yellow departments, including legal, labor relations, human resources, risk management, security, and worker's compensation.  Peak alleges O'Connor did so because these were the departments that Defendants had agreed would fall under Peak's purview.  Though Peak states that he inquired several times about the meeting, it never took place because O'Connor's and Hawkins' availability did not coincide.

In September 2020, Yellow named Leah Dawson as its new Executive Vice President and General Counsel.  Peak alleges that O'Connor advised him that Dawson was chosen because of her sex and because Yellow wanted to increase the diversity of its executives.  Peak expressed his dissatisfaction with this choice to O'Connor via email.  O'Connor responded simply that the decision was largely out of his control and urged Peak to brainstorm other "creative options (titles, responsibilities, etc.)" for his future position.

Yellow transmitted a formal employment offer to Peak on December 3, 2020.  The offer was for the position of Executive Vice President of Labor Affairs, which Peak alleges was an entirely new position created specifically for him.  Five days later, the private equity firm acquiring AWP offered him a package that, according to projections, would result in millions in pre-tax proceeds per year.  Peak forwarded this information to O'Connor, and negotiations continued. Ultimately, On December 19, 2020, Peak signed and returned Yellow's offer, which he alleges contained the following terms:

1.  Start date of January 4, 2021;

2. Annual base salary of $400,000;

3. Signing bonus of $100,000, which would be fully retained by Peak after one year with Yellow, termination by yellow other than for cause, or termination by Peak for "good reason."

4. Participation in Yellow's short-term and long-term executive incentive program; and

5. Severance of Peak's current base salary for 18 months post-termination if Yellow terminates his employment without cause or Peak terminated his employment for a "good reason."

The signed offer letter did not include a description of Peak's job responsibilities. Peak alleges this was because he and Defendants had already agreed his responsibilities would include labor relations and many non-securities legal functions of the company. In an email to O'Connor, Peak noted this omission and then listed those areas he believed fell under his purview, offering to add these areas to the offer letter and sign it again. Defendants admit that O'Connor never responded to Peak. Peak alleges O'Connor emailed Hawkins with a message intended for Peak, which read "Thanks Jack, I think this language is good. We can work through any details. I am excited to get going with you leading these efforts."

Defendants, for their part, deny that Yellow ever entered into such an employment agreement with Plaintiff. They state that Exhibit A, cited by the Second Amended Complaint as the offer letter and Peak's email response, speaks for itself, but deny his remaining allegations as to the offer and its terms.

In preparation for his January 4 start date, Peak requested copies of the staff roster, with descriptions of each job title, and an organizational chart for several areas, including risk,

employment, and all non-accident litigation.  He also requested that O'Conner set up a meeting with Dawson, the recently hired General Counsel, to "start getting a handle on the landscape." Peak alleges that Dawson was never informed that most non-securities legal functions of Yellow would be placed under Peak's control rather than her own.

Peak also continued to negotiate with Strauch, again allegedly with O'Connor's knowledge and consent.  Peak proposed that Strauch be hired at the same base salary as himself, but O'Connor informed Peak that he could not get approval to make such an offer to Strauch due to the position grades used by Yellow at that time.  According to Peak, O'Connor left it up to him to determine an acceptable compensation plan, so long as it worked within Yellow's guidelines, and encouraged Peak to "be creative."  Peak ultimately engaged Strauch to work for Yellow under a consulting agreement, under which Strauch would be responsible for overseeing all litigation on behalf of Yellow.  The terms of the consulting agreement permitted Strauch to terminate the consulting agreement in the event Peak ceased being responsible for Yellow's litigation and claims programs, a provision referred to as a tying provision.  Peak alleges he informed O'Connor that he had "gotten creative" with Strauch and that he was "on board," to which O'Connor replied, "Good."  Peak also alleges that he informed Hawkins that Strauch was hired.

On December 28, 2020, Peak contacted O'Connor about two promotions Dawson had made in Yellow's employment law group.  He expressed concern that Dawson did not understand that area would be under Peak's supervision.  O'Connor suggested a conference call between himself, Peak, Dawson, and Hawkins "to make sure we are all aligned" in advance of Peak's start date.  The conference call took place, but Dawson was not present.  Peak alleges that none of the information discussed on the call was shared with Dawson.

On his first day, Peak alleges he again reached out to O'Connor over concerns that Dawson did not understand the areas that now were under his control.  He outlined that "all litigation; BIPD; risk & insurance; worker's compensation; subrogation; employment claims and litigation; cargo claims; contracts; the ethics hotline; and any matters related to these functions" would be under his position and expressed that Hawkins should discuss as much with Dawson.  According to Peak, O'Connor responded: "Thanks Jack, I will share with Darren for his discussion with Leah. Some of these areas do not roll up to Leah now so you and I will need to decide how to implement. I'm not sure you want to get tied up with all aspects of some of these areas."  O'Connor then forwarded Peak's email to Hawkins.

Peak met with Dawson two days later.  At this time, Peak discovered that Dawson had never been made aware about the transfer of the lion's share of the Yellow's non-securities legal functions to Peak's control.  Peak discussed this with Hawkins, who reportedly told Peak that he would speak to Dawson and she would "do what I tell her."  Peak states that he could have still returned to AWP at this time, had Hawkins informed him that these areas would not be transferred to his control, which he alleges was Hawkins' plan all along.

Peak continued to work on his plan to restructure Yellow's legal department throughout February 2021.  He emailed his restructuring plan to O'Connor and Hawkins on February 12, and he alleges neither responded with any limitations on his plan.  But on March 14, 2021, Hawkins informed Peak that he would not be given responsibility for Yellow's legal functions beyond labor relations.  Two days later, Peak resigned his position based on this decision.  Though Peak alleges this resignation was for a "good reason" under his employment contract, he has not received any severance payments.

**B.      Allegations of the Second Amended Counterclaim**

Defendants' counterclaim focuses largely on Peak's hiring of Strauch.  Defendants allege that Peak's hiring of Strauch under the purported consulting agreement violated his fiduciary duties to Yellow as its lawyer, was fraudulent, and constituted a civil conspiracy between Peak and Strauch.  Peak and Strauch, both attorneys, allegedly had a pre-existing personal relationship that led the two of them to seek to secure a deal for Strauch on detrimental terms to Yellow.

Defendants allege Peak had been advised by O'Connor that Strauch would not get a deal like Peak's—that is, Yellow would not hire Strauch as a full-time employee at the compensation level similar to Peak's and would not agree to the tying provision.  When Peak sought further guidance from O'Connor, O'Connor informed him that if he sought to hire Strauch as a full-time employee, he would need to create a job description and proposed job grade, which would need to be approved by Yellow.  Peak advised that he would do so, but according to Defendants, never provided a proposed job description or job grade for Strauch.

Yellow has a corporate policy regarding authorizations for expenditures ("AFE policy").  Under the policy, expenditures for contract and temporary labor over $10,000 must be approved.  Defendants allege that Peak knew or should have known that he did not have unilateral authority to approve a consulting agreement for Strauch in excess of this policy.

Peak ultimately offered a consulting agreement to Stauch, which he accepted on January 9, 2021.  This consulting agreement allegedly mirrored the original, rejected compensation and tying provisions.  Peak and Strauch both signed the agreement.  According to Defendants, this agreement was never presented to O'Connor, Hawkins, or any other executive of Yellow.  Nor was any executive of Yellow made aware of its material provisions prior to the receipt of Strauch's resignation letter on March 16, 2021.  To disguise their misdeeds, Defendants allege that Peak

passed off Strauch's work as his own multiple times, causing Yellow to be unaware of the source of these services and causing them to pay for legal work twice—both by way of Peak's salary and Strauch's consulting fee.

In addition, Defendants allege that Peak unlawfully converted his $100,000 signing bonus. They allege that because he voluntarily resigned his employment within one year, he was required to return a prorated portion of the signing bonus. Though Yellow demanded that he do so, Peak has yet to return any amount of the signing bonus. Yellow denies that a valid employment contract existed between itself and Peak but alleges in the alternative that if a valid employment contract existed, Peak has breached that contract by not returning the prorated portion of the signing bonus.

## II.     Legal Standard

Under Rule 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[2] A plaintiff may likewise move to dismiss the defendant's counterclaim.[3] Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.' "[4] A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[5] The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well the grounds on which each claim rests.[6] Under Rule 12(b)(6), the court must accept as true

---

[2] Fed. R. Civ. P. 12(b)(6).

[3] *Jones v. Addictive Behav. Change Health Grp.*, LLC, 364 F. Supp. 3d 1257, 1265 (D. Kan. 2019).

[4] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[6] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[7]  Viewing the complaint in this manner, the court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[8]

Judgment on the pleadings under Rule 12(c) "is appropriate only when 'the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.' "[9] "If the motion is brought by the plaintiff, the 'critical question is whether the defendant's answer raises issues of fact that would defeat the plaintiff's recovery.' "[10]

### III.    Analysis

### A.    Defendants' Motion to Dismiss Count II of Peak's Second Amended Complaint

Count II of Peak's Second Amended Complaint alleges fraudulent inducement on the part of Yellow, O'Connor, and Hawkins.  Peak alleges that, in the course of his recruitment as the Executive Vice President of Labor Affairs for Yellow, O'Connor and Hawkins, on behalf of Yellow, both misrepresented material facts and concealed material facts by their silence.  Namely, he alleges that O'Connor and Hawkins represented that they agreed with Peak's vision to restructure Yellow's labor relations and legal functions when, in fact, they never planned to give Peak the authority to do so.  Defendants move to dismiss, arguing that Peak fails to allege fraud with particularity as required by Fed. R. Civ. P. 9(b).

---

[7] *Iqbal*, 556 U.S. at 678.

[8] *See id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.") (citation omitted).

[9] *Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1141 (10th Cir. 2012) (quoting *Park Univ. Enters., Inc. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006)).

[10] *Smith v. Amazon.com Servs. LLC*, 2021 WL 5371481, at *1 (D. Kan. 2021) (quoting *Volvo Fin. Servs. v. JRD Contracting, Inc.*, 2017 WL 8941065, at *2 (S.D. Ala. 2017).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[11] Particularity requires the plaintiff to allege "the time, place, and contents of the false representation; the identity of the party making the false statements; and the consequences thereof."[12] When the complaint alleges fraudulent conduct on the part of several defendants, the plaintiff "must specify, with particularity, which defendant is responsible for which fraudulent act."[13]

Defendants argue that Peak fails to allege the "time, place, and contents" of their misrepresentations. Specifically, Defendants contend that nowhere in the Second Amended Complaint does Peak identify actionable misrepresentations—that is, affirmative representations that were false at the time they were made[14]—they are purported to have made.

Defendants are incorrect. Peak identifies alleged misrepresentations by each individual Defendant in acceptable detail. For instance, he states that during a March 13, 2020, meeting at the Detroit airport Westin hotel, both Hawkins and O'Connor expressed agreement with his vision of restructuring the labor relations department with other legal functions under his control and expressed willingness to give him the authority to make this a reality when, he alleges, neither Defendant ever intended to give him this authority. The Second Amended Complaint sufficiently alleges the "time, place, and contents" of the alleged misrepresentations to meet the requirements

---

[11] Fed. R. Civ. P. 9(b).

[12] *Bevan v. Butler & Assocs., P.A.*, 2017 WL 6557418, at *12 (D. Kan. 2017) (cleaned up) (quoting *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016)

[13] *Beckner v. The Consumers Tr.*, 2006 WL 618134, at *2 (D. Kan. 2006).

[14] *See Frickey v. Thompson*, 136 F. Supp. 3d 1300, 1316 (D. Kan. 2015).

of Rule 9(b).[15]  It specifies clearly "which defendant is responsible for which fraudulent act."[16]
And it also alleges that the statements were false at the time they were made.[17]

Defendants call these alleged misrepresentations non-actionable because the role Peak
envisioned for himself was undefined at the March 13 meeting.  In essence, Defendants suggest
that the alleged false representations were not statements of "existing" facts.[18]  This is incorrect.
Even if the role itself was not yet fully fleshed out, Peak alleges that he made clear the broad reach
of the authority that he envisioned for that role.  He further alleges that O'Connor and Hawkins
both expressed a willingness to ensure that his new position had the necessary authority for Peak
to implement his ideas, even though they were both, at that time, unwilling to do so.  These are
allegations as to facts "existing" at the time of the March 13 meeting.

Relatedly, Defendants contend that Peak's allegations as to the March 13 meeting are
implausible.[19]  They suggest that the Court must "suspend reality" to accept that top executives of
a Fortune 500 company were prepared to give Peak discretion to make "whatever changes were
necessary to implement his ideas."[20]  But Defendants take this piece of the Second Amended
Complaint out of context.  Peak's allegations are that he wanted a position with authority beyond
just labor relations, and that O'Connor and Hawkins expressed willingness to place other legal
functions under his purview.  There is nothing inherently implausible about top executives of a

---

[15]  Defendants, in their reply brief, dedicate a footnote to attacking other allegedly fraudulent
misrepresentations raised by Peak.  The Court does not address arguments made in a perfunctory manner, such as
those raised in a footnote. *United States v. Judd*, 42 F. App'x 140, 144 (10th Cir. 2002).

[16] *Beckner*, 2006 WL 618134, at *2.

[17] *Frickey*, 136 F. Supp. 3d at 1316.

[18] *Id.*

[19] *Twombly*, 550 U.S. at 556.

[20] Pl's Second Am. Compl., Doc. 68, at ¶ 32

-12-

company, while recruiting another executive, expressing willingness to expand the authority of that new position.[21]

In sum, no reason urged by Defendant warrants dismissal of Count II of Peak's Second Amended Complaint.  That Motion is denied.

## B.   Peak's Motion to Dismiss Defendants' Second Amended Counterclaim

Peak moves to dismiss each of the five counts of Defendants' Second Amended Counterclaim.  The Court examines each in turn.

### 1.   Breach of Contract

Peak moves to dismiss Defendants' breach of contract counterclaim, pled in the alternative. He ask the Court to conclude, as a matter of law, that he had a "good reason" to resign under the contract, and thus he is entitled to retain the $100,000 signing bonus.  To so conclude, the Court would have to first conclude that: (1) an employment contract existed; (2) the terms of that instrument include the areas of responsibility Peak listed in his response, to which Defendants allege they did not respond and did not accept; and (3) Peak resigned because of a diminution of his agreed upon job responsibility, which Defendants again deny.  The Court will not do so at this nascent stage of the litigation, especially considering it requires the Court to largely accept Peak's version of the facts over that of Defendants.[22]   Though Peak is correct that "[w]hether the

---

[21] Defendants also contend that Peak's fraudulent misrepresentation claim cannot be based on an alleged misrepresentation that Yellow would hire Strauch.  Peak's response does not appear to rely on this theory, so the Court need not address that argument at this time.

[22] *See S.A.I., Inc. v. Gen. Elec. Railcar Servs. Corp.*, 935 F. Supp. 1150, 1156 (D. Kan. 1996) ("Plaintiff correctly argues in its brief that the instances to which defendant points as providing the basis for its motion to dismiss reveal only areas of factual dispute. Whether GERSCO followed the requisite method of transfer under the License Agreement with its May 2 Notice, whether SAI's remarks amounted to a denial of the period to cure, and similar questions raised by defendant's motion would require interpretation of the language of the contract, the correspondence, and the surrounding circumstances at the time—items which are not the appropriate subject of a 12(b)(6) motion.").

undisputed facts establish the existence and terms of a contract raise a question of law for the court's determination,"[23] there quite clearly remain disputed facts here that prevent the Court from making such a determination at this time.

2. *Conversion*

Peak contends Defendants' conversion claim must be dismissed because a "conversion claim cannot be brought where the property right alleged to have been converted arises entirely from the [party's] contractual rights."[24]   Defendants respond that when, as here, the existence of the contract is disputed, courts have permitted the alternative pleading of conversion and contract causes of action.[25]   This is true, and Defendants do dispute the existence of a contact here.   But regardless, their claim for conversion is based solely on the provisions of Peak's employment contract requiring Peak to return a prorated portion of the $100,000 signing bonus if he resigned his employment without "good reason" before one year.   Thus, the property right alleged to have been converted arises entirely from Yellow's rights under Peak's employment contract.   The conversion claim is not an "independent tort," and the Court finds that Defendants must rely on its breach of contract claim.[26]   Defendants' counterclaim for conversion is dismissed.

---

[23] *3-B Cattle Co. v. Morgan*, 2019 WL 7116090, at *3 (D. Kan. 2019).

[24] *Glob. Fitness Holdings, LLC v. Fed. Recovery Acceptance, Inc.*, 127 F. Supp. 3d 1198, 1207 (D. Utah 2015) (applying Kentucky law); *see also First Media Ins. Specialists, Inc. v. OneBeacon Ins. Co.*, 2011 WL 5570799, at *6 (D. Kan. 2011) ("Generally, 'when parties enter into a contract which defines their respective rights and duties, tort causes of action concerning the same subject matter as the contract are precluded.' ") (quoting *Regal Ware, Inc. v. Vita Craft Corp.*, 653 F. Supp. 2d 1146, 1152 (D. Kan. 2006)).

[25] *Regal Ware*, 653 F. Supp. 2d at 1152 ("[W]hen conduct could satisfy the elements of both a breach of contract or of an independent tort, unless the conduct is permitted by express provisions of a contract, a plaintiff may pursue both remedies."); *see also Delcavo v. Tour Res. Consultants, LLC*, 2021 WL 4453572, at *3 (D. Kan. 2021).

[26] *Regal Ware*, 653 F. Supp. 2d at 1152 ("Therefore, the MLA created and defined the rights to the Advance Royalty and thus the conversion claim is not independent of the contract claim.").

3.     *Fraud*

Defendants bring counterclaims against Peak for both fraudulent misrepresentations and fraudulent concealment related to his hiring of Strauch.  Specifically, they identify the following as the basis for their fraud claims: (1) Peak's alleged conspiracy with Strauch to construct a consultant agreement awarding Strauch far in excess of Peak's $400,000 annual salary, with a tying provision that would result in over $2 million in payments to Strauch in the event that Peak's employment ended; (2) Peak's signing of the consultant agreement purportedly on behalf of Yellow without complying with Yellow's AFE procedures and without discussing the agreement with anyone at Yellow; and (3) Peak's forwarding privileged information to Strauch and passing off Strauch's work product as Peak's own.

A claim for fraudulent misrepresentation requires, unsurprisingly, an alleged misrepresentation.[27]  A misrepresentation involves "[t]he act or instance of making a false or misleading assertion about something."[28]  Defendants do not identify *any* representation Peak is alleged to have made, especially not with the particularity required by Rule 9(b).[29]  This is clearly fatal to that claim.  To the extent Defendants counterclaim for fraudulent misrepresentation, that claim is dismissed.[30]

At most, Defendants' allegations raise a potential claim for fraudulent concealment, as they largely identify the actions Peak took to hire Strauch which, they allege, Peak should have brought

---

[27] This is true regardless of whether the Court applies Kansas or Ohio law.  *See Gentile v. Ristas*, 160 Ohio App. 3d 765, 828 N.E.2d 1021, 1033 (2005); *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083, 1096 (2013).

[28] *Misrepresentation*, Black's Law Dictionary (11th ed. 2019).

[29] Fed. R. Civ. P. 9(b) (requiring a party alleging fraud or mistake to allege facts with particularity).

[30] *See Freedom Transportation, Inc. v. Navistar Int'l Corp.*, 2020 WL 430213, at *4 (D. Kan. 2020) (dismissing fraudulent inducement claim for failure to plead with particularity under Rule 9(b) because "Plaintiff does not identify any specific communication, when and where it was made, or its contents.").

to the attention of other Yellow executives.  Peak responds that a claim for fraudulent concealment, requires that he "had knowledge of material facts that [Defendants] did not have and could not have discovered by the exercise of reasonable diligence."[31]  Peak goes on to say that Defendants counterclaim must be dismissed for failure to "allege with particularity any 'facts that would have prevented them from knowing the concealed fact and must also allege that their ignorance was not the result of their own lack of diligence.' "[32]

The Court does not agree.  Defendants have alleged with particularity facts that suggest their ignorance of the consulting agreement with Strauch was not the result of their own lack of diligence.  Though O'Connor discussed the hiring of Strauch with Peak several times in late 2020, Defendants plausibly allege that Peak shared no more information with them about the hiring, including whether Strauch had been hired at all.  It is alleged that Peak did not discuss the creation of a position grade in Yellow's system with O'Connor and he did not share the ultimate consulting agreement with anyone at Yellow.  Not only this, but Defendants allege that Peak took steps to conceal the agreement from them by farming out work to Strauch and taking credit for that work, thus apparently disguising Strauch's involvement with Yellow.  At this early stage, Defendants have plausibly alleged their ignorance was not the result of their own lack of diligence.  The Court will not dismiss Defendants' fraudulent concealment claim on that ground.

### 4.    *Breach of Fiduciary Duty*

Defendants' counterclaim for breach of fiduciary duty is premised on Peak's conduct while he was Yellow's attorney, during which he allegedly attempted to hire Strauch at terms deeply

---

[31] *Stechschulte*, 298 P.3d at 1097.

[32] *Near v. Crivello*, 673 F. Supp. 2d 1265, 1280 (D. Kan. 2009) (cleaned up).

unfavorable to Yellow.  Peak asks the Court to dismiss this claim, contending that Delaware law governs and requires this result.  Specifically, Peak notes that, under Delaware law, "where a dispute relates to obligations expressly treated by contract, it will be governed by contract principles."[33]  Thus, "[i]f the 'fiduciary claims relate to obligations that are expressly treated' by contract, then this Court will review those claims as breach of contract claims and any fiduciary claims will be dismissed."[34]

Even assuming Delaware law applies to this claim—an issue the Court need not reach at this time—dismissal is not warranted.  Delaware law does not require dismissal of a breach of fiduciary duty claim when that claim is not identical to the contract claim in terms of scope and remedy.[35]  Here, while the two claims share a "common nucleus of operative facts,"[36]  they are concerned with different allegedly wrongful conduct, and each would be remedied differently. Defendants' breach of contract claim, pled in the alternative, is concerned solely with Peak's allegedly wrongful retention of the pro rata portion of the signing bonus after his resignation.  The remedy requested is simply the return of the appropriate portion of the signing bonus.  The breach of fiduciary duty claim, by contrast, relates to Peak's conduct in hiring Strauch.  Defendants seek a slew of remedies—including all of the compensation and benefits paid to Peak during the time he was employed at Yellow and was in breach of his fiduciary and ethical obligations, as well as damages in the amount of the legal and settlement costs incurred by Yellow related to Strauch's own lawsuit against Yellow.  These claims cover significantly different ground, and thus the

---

[33] *Nemec v. Shrader*, 2009 WL 1204346, at *4 (Del. Ch. 2009), *aff'd*, 991 A.2d 1120 (Del. 2010) (cleaned up) (quoting *Madison Realty Co. v. AG ISA, LLC*, 2001 WL 406268, at *6 (Del. Ch. 2001)).

[34] *Id.* (quoting *Madison Realty*, 2001 WL 406268, at *6).

[35] *Schuss v. Penfield Partners, L.P.*, 2008 WL 2433842, at *10 (Del. Ch. 2008).

[36] *Id.*

breach of fiduciary duty claims is not "superfluous" under Delaware law and will not be dismissed.[37]

     *5.    Civil Conspiracy*

Defendants allege a civil conspiracy between Peak and Strauch to fraudulently conceal Strauch's consulting agreement, in violation of their fiduciary duties. Peak contends that because the fraud and breach of fiduciary duty claims must be dismissed, Defendants have not plausibly alleged an unlawful overt act.[38] As discussed at length above, the Court has not found dismissal of either of those claims is warranted. Since is the only ground for Peak's Motion to Dismiss this counterclaim, that Motion is denied.

## C.    Peak's Motion for Judgment on the Pleadings

This Motion, as Defendants ably point out, is borderline frivolous. Peak asks the Court to grant him judgment on his two claims based solely on the pleadings under Rule 12(c). In doing so, he would have the Court accept only his version of the story and ignore Defendants' numerous and repeated denials in their answer. He also asks the Court to consider the thirteen exhibits attached to his Motion. Neither of these steps are appropriate at this stage.

Peak first contends that judgment on the pleadings is appropriate on his claim for breach of contract. His argument is similar to his Motion to Dismiss Defendants' breach of contract counterclaim. Essentially, he asks the Court to find—considering the thirteen exhibits attached to his Motion[39]—that an employment contract existed between himself and Yellow, that the terms of

---

[37] *Gale v. Bershad*, 1998 WL 118022, at *5 (Del. Ch. 1998).

[38] *Triple-I Corp. v. Hudson Assocs. Consulting, Inc.*, 713 F. Supp. 2d 1267, 1289 (D. Kan. 2010) (laying out the elements of civil conspiracy under Kansas law).

[39] As noted above, the Court does not consider these exhibits at this time.

the contract included the "areas of responsibility" he sent to O'Connor separately, that he resigned

for a "good reason" under the contract because Yellow refused to give him responsibility over the

requested areas, and that Yellow breached the agreement by failing to pay him severance.

"Whether the undisputed facts establish the existence and terms of a contract raise a

question of law for the court's determination."[40]  But contrary to Peak's suggestions, there remain

a great deal of disputed facts here.  Defendants' answer disputes, among many other things, the

existence of any agreement, the terms of the agreement, whether Peak's email to O'Connor

regarding his expectation as to his job duties became part of the agreement, and whether Peak

terminated his employment for a "good reason" under the contract.[41]  And while Defendants state

that certain documents "speak for" themselves, this does constitute an admission that the document

is authentic unless followed by a clear admission to that effect, which Defendants have not done

here.[42]

Peak's Motion for Judgment on the Pleadings on his fraud claim is likewise utterly

meritless.  His argument relies entirely on Defendants' statement that the December 19, 2020,

email "speaks for itself."  As noted, however, this statement does not constitute an admission that

the document was authentic.  Further, the Court fails to see how this one email could establish the

entirety of Peak's fraud claim, as it is an email sent by himself to O'Connor.  In other words, Peak

asks the Court to enter judgment in his favor based solely on *his own statements* to O'Connor, in

---

[40] *3-B Cattle Co. v. Morgan*, 2019 WL 7116090, at *3 (D. Kan. 2019) (quotation omitted).

[41] Defs' Answer, Doc. 82, at ¶ 64-67, 97, 112, 113, 117-125.

[42] *See Kleiman v. Wright*, 2020 WL 11420664, at *9 (S.D. Fla. 2020) ("Here, there is no deliberate, clear, and unambiguous admission by Defendant that the emails and other documents referenced in the SAC are accurate, authentic, or otherwise subject to Plaintiffs' interpretation.  Instead, the response admitted only that the words reflected in the exhibit appear in the document at issue.").

which he "articulated the misrepresentation."[43]  This, frankly, is an absurd request.  Plaintiff's Motion for Judgment on the Pleadings is denied.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Count II of Plaintiff's Second Amended Complaint (Doc. 80) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Dismiss Defendants' Counterclaim (Doc. 98) is **GRANTED** in part and **DENIED** in part, as laid out herein.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Judgment on the Pleadings (Doc. 100) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 12th day of July, 2023.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[43] Pl's Memorandum in Support of Motion for Judgment on the Pleadings, Doc. 101, at 13.